MURTHA (KNOX v.). See Case No. 7.911.

## Case No. 9,970.

MUSCAN HAIR MANUF'G CO. v. AMERICAN HAIR MANUF'G CO.

[1 Fish. Pat. Cas. 320; 4 Blatchf. 174; Merw. Pat. Inv. 237.] [1]

Circuit Court, S. D. New York. May 6, 1858.

PATENTS—PRELIMINARY INJUNCTION — EXCLUSIVE POSSESSION — DOUBTFUL INFRINGEMENT — PRACTICE IN EQUITY—BILL RETAINED.

1. A preliminary injunction will be refused, unless upon proof of exclusive possession under the patent, or of public acquiescence in the exclusive right of the patentee or of a trial at law.

2. Whether a claim, embracing the use of any metallic sulphate, in connection with any alkali; or, any sulphate having an alkaline base, could be sustained, upon proof that substantially the same proportions, of other sulphates than those named in the specification, would not produce the required result. Quaere.

3. Where the patent is recent, the specification obscure, and the proof of infringement meager and unsatisfactory, the court will not grant an injunction, even upon final hearing, but will retain the bill and require the complainant to bring an action at law.

4. The terms, upon which such an order will be made, stated.

In equity. This was a final hearing, on pleadings and proofs, on a bill for an injunction and account, founded on the alleged infringement of letters patent [No. 16,961] granted to Samuel Barker, dated April 7th, 1857, and assigned to the plaintiffs, for an "improvement in processes for treating moss for mattresses." In the specification, the invention was said "to consist in preparing or treating the ordinary moss of commerce, by saturating its fibre with certain metallic sulphates in connection with alkalies, and which will not be separated therefrom by washing, which increases its hardness and elasticity, and renders it indestructible by moisture or exposure to the weather, whereby it is capable of being employed to advantage in various upholstery manufactures, wherein hitherto only the best quality of curled animal hair, could be used satisfactorily." This specification stated the processes by which the desired results were to be obtained, as follows: "My treatment is as follows: I prefer to use sulphates of both characters, viz: a sulphate having a metallic base, as the sulphate of iron, and a sulphate having an alkaline base, as the sulphate of soda; and, to the action of these, the crude moss, having been cleared by the usual machine from the dirt and bark with which it is admixed, is submitted, in a liquor prepared by dissolving in one hundred gallons of water fifty-six pounds of sulphate of iron, to which is then added sixty-five pounds of sulphate of soda, the whole being well mixed. In this the moss is to be kept im-

[1] [Reported by Samuel S. Fisher, Esq., and Hon. Samuel Blatchford, District Judge, and here compiled and reprinted by permission. The syllabus and opinion are from 1 Fish. Pat. Cas. 320, and the statement is from 4 Blatchf. 174. Merw. Pat. Inv. contains only a partial report.]

mersed, say from thirty-six to forty-eight hours, and, when taken out, is to be well washed in clear water, dried, and passed again through the clearing machine, when it will be ready for use." The specification then stated, that it might be desirable to have the article dyed black, to render it more uniform in appearance, and proceeded to describe a process for giving it that color; and it then gave a mode for testing the proper preparation of the moss, when treated according to the specification. It also contained a statement that "other metallic sulphates, as well as other alkaline matters, will effect, in combination, the same desired result, as, for instance, the sulphate of copper, in connection with sulphate of soda. or with pure soda;" but that the patentee had found that neither alone would accomplish the purpose attained by his invention. The claim of the patentee was in these words: "I claim the method of treating or preparing the moss of commerce. to serve as a substitute for curled animal hair, substantially as set forth herein." The bill alleged, that the defendant had used, and was still using. the processes so patented, in the treatment of moss, and had sold, and continued to offer for sale, moss so prepared and treated. in violation of the rights of the plaintiff, as assignee of the patentee, and prayed an account and an injunction. The defendants' answer admitted the issuing of the patent, but denied that Barker discovered or invented the improvement patented, and averred that such processes were known and in use before his alleged discovery and application for a patent therefor. It also denied the infringement alleged. The bill was filed June 26th, 1857, less than three months after the issuing of the patent.

Edward Hoffman, for plaintiffs.
Francis G. Young, for defendants.

HALL, District Judge. And if there has, in fact, been any infringement by the defendants, it is more than probable that the defendants' use of the process patented began sometime prior to the issuing of the patent, and was continued until or near the time of the commencement of the suit.

In short, there is no proof to show any exclusive possession under the patent: there is no proof of such a public acquiescence in the exclusive right of the patentee as would justify the assumption that the claim to such exclusive right is well founded, and there has been no trial at law. And, therefore, if this was a motion for a preliminary injunction, instead of the final hearing of the cause, it is quite clear that an injunction would not be granted without a previous trial at law, to establish the complainants' right.

Objections were also taken' to the sufficiency of the specification, and if the claim should be so construed as embracing the use of any metallic sulphate in connection with any alkali, or any sulphate having an alkaline base, these objections might deserve serious consideration upon the trial of an action for an infringement, especially if it should appear that substantially the same proportions of other sulphates would not produce the result which is said to be produced by the use of the sulphate of iron and sulphate of soda in the proportions and manner set forth in the specification. On this ground, also, I can not but feel some doubt in regard to the right of the complainants to the injunction and account prayed for by their bill.

On the question of infringement, too, the proof is very meager and unsatisfactory. The proof shows that on the 17th of June, 1857, nine days before the filing of the bill, a person purchased of the agent of the defendants, at their place of business, four pounds of prepared moss, and some fifteen or twenty bales of the same, or a similar article, at the same place. The moss so purchased was delivered to Dr. James R. Chilton, chemist, who made a set of experiments upon it for the purpose of ascertaining whether it contained the ingredients described in the specification annexed to Barker's patent. He found that it contained sulphate of iron, and sulphate of soda, and coloring matter. And he gave it, as his opinion, that this moss had been treated with the same substances described in Barker's specification; but the manner of treatment, or whether the sulphate of iron and sulphate of soda had been used in the proportions given in that specification, he confessed himself unable to state. These proportions, he says, are not, in his opinion, essential to the effect produced; but he does not say how far they may be departed from, without failing to produce the effect said to be produced by the use of the process described in Barker's specification.

There was also evidence given, showing the purchase, by the defendants, of sulphate of iron and sulphate of soda in considerable quantities, but in very different proportions from those stated in Barker's specification, as well as evidence to show that the defendants were first made acquainted with the process of treating moss for the purpose of improving its quality and adding to its value, by a person who had learned from Barker a mode or modes of treatment adopted by him prior to his application for a patent.

On the other hand, there is some proof to show that the processes adopted by the defendants (it appearing that different processes were used at different times) are not like the processes described in the specification annexed to Barker's patent, but were essentially different from that process, and different, to some extent, at least, from each other. But this evidence, like all the other evidence bearing upon the question of infringement, was indefinite and unsatisfactory.

This evidence does not sufficiently show that the patented process has been used by the defendants, if the proportions are substantially the proportions stated in the specification, and the modus operandi there described is essential to that process.

It certainly would be sufficient to raise a strong presumption that the patented process has been used, if there was no proof that substantially the same results could be produced by other and distinct processes; but as this has been stated, rather than satisfactorily proved, by witnesses on the part of the defense, I think there is so much doubt even upon the question of infringement, that there should be a trial at law before an injunction and account are ordered.

The right of the plaintiffs is not, therefore, clear; and this cause will therefore stand over a reasonable time, for the bringing of a suit at law against the defendants for an infringement; and if such a suit is brought, until a sufficient time for the final determination thereof has elapsed. And if, in such suit, there shall be final judgment for the plaintiffs, they will be entitled to a decree for injunction and account, as prayed for in the bill; and if, in such suit, there shall be final judgment for the defendants, the bill will be dismissed with costs; and so, also, it will be dismissed with costs on an application of the defendants, if such suit is not brought within a reasonable time, and prosecuted with reasonable diligence.